PEOPLE v. MILLER.

1. CRIMINAL LAW—EVIDENCE OF INTOXICATION—BLOOD TEST—URINALYSIS.

A suspect's sample of urine shown to have been taken at a time reasonably soon after the incident giving rise to prosecution for driving a motor vehicle under the influence of intoxicating liquors, subjected to a test having general scientific recognition, with results correlated to the probable blood alcohol concentration at the time of the violation charged, is properly admissible as bearing upon the issue of intoxication (CLS 1956, § 257.625).

2. SAME—URINALYSIS—MATTERS OF DEFENSE—EVIDENCE.

Abnormality of the individual, use of faulty techniques or unclean instruments in making a urinalysis to determine alcoholic content of blood of person charged with having operated a motor vehicle while under the influence of intoxicating liquors, are properly matters of defense, going to the weight to be given the evidence, but not grounds for its complete exclusion (CLS 1956, § 257.625).

---

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 5A Am Jur, Automobiles and Highway Traffic §§ 1245–1250.
Admissibility and weight of evidence based on scientific test for intoxication or presence of alcohol in system. 127 ALR 1513, 159 ALR 209.
Driving while intoxicated as a substantive criminal offense. 42 ALR 1498, 49 ALR 1392, 68 ALR 1356.
[4] 25 Am Jur, Habitual Criminals and Subsequent Offenders § 5.
Constitutionality and construction of statute enhancing penalty for second or subsequent offense. 58 ALR 20, 82 ALR 345, 116 ALR 209, 132 ALR 91, 139 ALR 673.
[5] 5A Am Jur, Automobiles and Highway Traffic § 1092.

3. EVIDENCE—URINALYSIS—INTOXICATION.

    Results of urinalysis, taken and interpreted by experts and which showed an alcoholic content of .20% in defendant's blood from sample of urine voluntarily furnished by defendant *held*, relevant and competent in prosecution for driving a motor vehicle while under the influence of intoxicating liquor, the weight of the opinion of the experts, together with that of the other evidence in the case being for the trier of the facts (CLS 1956, § 257.625).

4. STATUTES—AMENDMENT—RETROACTIVE EFFECT—PROSECUTION OF SECOND OFFENSE.

    Fact that statute was amended to provide a more severe penalty for second offense of driving motor vehicle while defendant was under the influence of intoxicating liquor after first offense had been committed is not construed as having a retroactive effect, in prosecution of the second offense, since it is the subsequent offense which is punished more harshly, not the first (CLS 1956, § 257.625).

5. CRIMINAL LAW—REQUESTS TO CHARGE—INSTRUCTIONS.

    It was not error for trial court to refuse to give defendant's requests to charge in prosecution for driving a motor vehicle while under the influence of intoxicating liquor, either in verbatim form or otherwise, where the instruction as given fairly covered the issues and the material substance embodied in the requests (CLS 1956, § 257.625).

Appeal from Kalamazoo; Fox (Raymond W.), J. Submitted June 4, 1959. (Docket No. 32, Calendar No. 47,634.) Decided October 13, 1959.

William I. Miller was convicted of operating a motor vehicle while under the influence of intoxicating liquor, second offense. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *John J. Peters,* Assistant Prosecuting Attorney, for the people.

*James B. Stanley,* for defendant.

Smith, J. The appeal here made is from a conviction for drunken driving.*

A police officer, in the early hours of the morning, observed a pick-up truck being driven in an erratic manner, weaving back and forth across the road. The car was stopped with some difficulty, the driver disregarding the red light and siren employed by the first officer attempting to stop him. Help having been obtained from other officers, the car was finally brought under control. As the driver got out of the truck "he just about fell as he was stepping off of his running board." He smelled of liquor. He had difficulty in getting his driver's license out of his pocket. He was taken immediately to the township police department. Here his eyes were checked, and found bloodshot, and his speech was observed to be slurred. When asked to place his right finger on his nose, "he took his left hand and put it flush, the complete hand, flush on the front of his face." It was the testimony of a second officer that the defendant had had too much to drink and was unable to drive a car. The defendant also voluntarily furnished a sample of urine when he was taken to the police station. It was analyzed for alcoholic content and evidence thereof admitted. With respect to it the defendant asserts that such a test is not of sufficient reliability to be admissible in evidence "to prove, at least in part, that the defendant is under the influence of alcohol to the extent that he should not drive a motor vehicle."

The people introduced on the subject the testimony of 2 witnesses, Dr. Edgar W. Kivela, a toxicologist with the Michigan department of health and assistant director of the State crime laboratory, and Robert M. Johnson, in charge of the laboratory

---

* The charge was brought under CLS 1956, § 257.625 (Stat Ann 1957 Cum Supp, § 9.2325), for an offense claimed to have been committed February 23, 1957.

of the city health department of the city of Kalamazoo. The defendant produced no witnesses to challenge the testimony adduced, but did challenge, upon cross-examination, the witnesses' conclusions, employing for such purposes extracts from learned articles in technical journals.

Mr. Johnson, who had analyzed the sample, described the test performed by him and testified that its reliability was recognized by chemists throughout the country. The sample so taken, and so analyzed, showed, he testified, a presence in the urine of .25% by weight of alcohol, corresponding to a blood content of .20% alcohol. (The alcoholic content of the body fluids, blood, spinal fluids, urine, and other, depends upon the water content of the fluid.* In the urine it is about 25% higher than that in the blood.)

The testimony of Dr. Kivela, also, was to the effect that the presence of alcohol in the human body may be detected by several commonly accepted tests, one of which is urinalysis, which test was described by him as being "very accurate." The trial court, after observing that "the *Morse Case* [*People* v. *Morse*, 325 Mich 270, dealing with the so-called Harger Drunkometer test] pointed out that there was no testimony that there was general acceptance by the medical profession or general scientific recognition of the results of the test," permitted ample and searching cross-examination of the expert on the point of a generally accepted standard before proceeding with further testimony. Such having been properly established, Dr. Kivela was then permitted to testify in part as follows:

"This value I just mentioned was from zero up to or through .04%, and at that stage the amount of

---

* See, also, Barclay, Miller and Nickolls, Blood and Urine Alcohol Tests in Cases of "Driving Under the Influence," 19 Medico-Legal Journal (Eng), 98.

alcohol influence is not sufficient to materially impair the individual. Now from .05% up through .14% individuals will vary. Now, the majority of your individuals are definitely under the influence when they get up to about .10%. Some individuals are definitely under influence below .10%. The majority are under the influence at .10%. At .14% it has been my findings in the people with whom I have worked, at .14% even the most resistant system was definitely under the influence.

"*Q.* Is there a point where it is almost universally accepted and agreed that everybody would have their driving ability affected to a point where they should not be driving?

"*A.* Yes. That is the point I was getting to. At .15% or above, every person who has yet been tested in all of the thousands that have been tested, everyone was definitely under the influence of alcohol at .15% or above to the point where that person was incapable of operating a motor vehicle with the same care and prudence that he would normally possess due to the impairment produced in the individual by the alcohol concentration in his or her blood.    *    *    *

"*Q.* Doctor, if any person is tested and their blood alcohol level was determined to be .20% which is this figure which we have here, would that person be under the influence to the point where he would not be able to drive a car safely?

"*A.* It is my opinion that anyone with .20% alcohol in their blood, which, of course, is above the .15%, would not be capable of operating a motor vehicle with the same care and prudence that they would normally possess and would not constitute a safe driver on the highway."*

---

* The opinion here expressed is conservative. The following, from Donigan's Chemical Tests and the Law (Traffic Institute, Northwestern University, 1957), indicates that concentrations of alcohol in the blood lower than .20% are considered by many authorities to establish the drinker as being under the influence of intoxicants:

"Of particular interest in this respect is the report of Michigan State University concerning its research project conducted for the National Safety Council during 1948–1951. Of the many persons

The defendant attacks the foregoing findings and conclusions upon various grounds.   It is asserted

tested as part of this project designed to evaluate the comparability and reliability of chemical tests to determine alcoholic influence, it was verified that, when the concentration of alcohol had reached or exceeded .15 per cent in the blood, as indicated by analysis of either the blood or breath, impairment of some type was noted in every case.   In most cases, impairment was evident 'far below' this .15 percentage point.

"Of special importance are the following recommendations in that report:

" 'The results of a chemical test should be employed to confirm conclusions drawn from clinical and physical diagnoses.   It should also be emphasized that arbitrary decisions based upon the so-called ".15% line of demarcation" be avoided.   This value has often been advanced as the dividing line between the "drunk" and the "sober." Such a position is not in accordance with the observed facts, for the vast majority of persons who have .12% or .13% alcohol in their blood are decidedly impaired with respect to their automobile-driving capabilities.

" 'Serious consideration should be given to a downward revision of this figure which has become so firmly entrenched in the minds of many who are confronted with this problem daily.   Greater emphasis should be placed on corroborating factors which are invariably brought to light in the "borderline" cases.

" 'The recommended uniform vehicle code delineates 3 zones of blood alcohol concentration for the guidance of law enforcement officials:   *i.e.,* .00–.05% safe; .05–.15% questionable; above .15%, definitely under the influence.   As a result of the work described in this paper, it is recommended that the lines of demarcation be amplified in the following manner:   .00%–.05% safe; .05%–.10% *possibly* under the influence; .10%–.15% *probably* under the influence; above .15% *definitely* under the influence.'

"In the consideration of the validity and fairness of the now well-recognized standard in this country that every motorist with as much as .15% alcohol in his blood is under the influence of intoxicants to the point that his driving ability definitely has been impaired, a comparison of standards in this respect in European countries is in order.   In some of those countries experience and experimentation in the field of chemical tests to determine alcoholic influence have been much more intensive over a longer period of time than in this country.   Therefore, the development of techniques and public acceptance of standards in this particular field have been more firmly established.   Public education and knowledge of the scientific principles involved are much further advanced than here.   This has resulted in correspondingly more stringent restrictions as far as the drinking driver is concerned in some of those countries.

"As examples, a statutory presumption has been established in Norway that a driver of a motor vehicle is under the influence of intoxicating liquor when as little as .05% alcohol is in his blood. In Sweden, a driver with as much as .08% alcohol in his blood while operating a motor vehicle is subject to 'a fine proportionate to his income or by imprisonment of not more than 6 months.'   A driver with an alcoholic concentration exceeding .15% 'is punished by im-

that urinalysis is "not reliable in establishing the alcohol blood level," pointing out that the receptacles used might be unclean, or that a defendant's overlong retention of urine might impeach the accuracy of the test made. It is argued, also that some individuals may be exceptions to general rules, able to withstand (without impairment of faculties) quantities of alcohol that would put others less rugged in a coma. If such be true it obviously has no bearing on the case before us. The defendant's weaving car, his staggering walk, and slurred speech are commonly recognized indicia of the influence of alcohol, not of rugged resistance thereto.

The evidentiary situation in this area of the law presents an odd combination of faith and of skepticism. Courts will freely admit as evidence of intoxication the testimony of untrained observers that a defendant had difficulty with his speech or his walking.* At the same time some courts will adamantly set their faces against the testimony of a scientific test because the results may be jeopardized by an abnormality of the individual, or the use of faulty techniques or unclean instruments in making the test. But even in respect of such commonly accepted lay indicia of intoxication as staggering, or impaired speech, these in truth may have resulted from pathological conditions entirely unconnected with intoxication, such as the results of cerebral concussion or of mild insulin shock.† If so, these

---

prisonment.' In Denmark, motor vehicle drivers ordinarily are found guilty of driving while under the influence when their blood alcohol concentration is found to exceed .10%. In Switzerland, it is usual for the courts to follow the same rule—when the blood alcohol concentration of a person operating a motor vehicle exceeds .10%, he is guilty of driving while under the influence. Thus, the nationally recognized standard in this country of .15% alcoholic concentration at which a motorist is considered definitely to be under the influence of intoxicants with respect to his driving ability is eminently fair to the driver." (pp 20, 21.)

* See *Suppe v. Sako*, 311 Ill App 459 (36 NE2d 603).

† Newman, Proof of Alcoholic Intoxication, 34 Ky L J 250, 253.

are proper matters to be shown in defense. A suspect's sample of urine shown to have been taken at a time reasonably soon after the incident complained of, subjected to a test having general scientific recognition, with results correlated to the probable blood alcohol concentration at the time of the violation charged, is properly admissible as bearing upon the issue of intoxication. Should the figure thus obtained and interpreted be misleading as to any particular individual's condition, because of abnormality of the person or the circumstances, these likewise are properly matters of defense, going to the weight to be given the evidence, but not, as argued, grounds for its complete exclusion.

So well established have these principles become at the time of this writing that, as it was noted in *Breithaupt* v. *Abram,* 352 US 432, 436, footnote 3 (77 S Ct 408, 1 L ed 2d 448):

"Forty-seven States use chemical tests, including blood tests, to aid in the determination of intoxication in cases involving charges of driving while under the influence of alcohol. Twenty-three of these States sanction the use of the tests by statute. *  *  *  The finding of the presence of a certain percentage of alcohol, by weight, in the blood of a person gives rise to a presumption that he was under the influence of intoxicating liquor. *  *  * Other States have accepted the use of chemical tests for intoxication without statutory authority but with court approval."

(We note, in passing, this comparison: the statutory presumption of intoxication in many States is set at a figure of .15% or more by weight of alcohol in the blood,* whereas in the case before us the

---

* See Donigan, Chemical Tests and the Law (1957).
"Certain findings and knowledge of the scientists and medical experts have been incorporated into the uniform vehicle code in the form of legal presumptions as follows:
"(a) It is unlawful and punishable as provided in paragraph (d)

alcohol concentration in the blood was determined to be .20%.)

The state of the law in this country has been summarized in an annotation in 159 ALR 209, 210, in the following terms:

"From the cases generally, it is apparent that, subject to compliance with conditions as to relevancy in point of time, tracing and identification of the specimen, accuracy of the analysis, and qualifications of the witness as an expert in the field, there is rather general agreement that where the prosecution in a criminal case seeks to establish the intoxication of the accused, evidence as to the obtaining of a specimen of his body fluid at or near the time in question, evidence as to the alcoholic content of such specimen, as determined by scientific analysis, and expert opinion testimony as to what the presence of the ascertained amount of alcohol in the blood, urine, or other body fluid of an individual indicates with respect to the matter of such individual's intoxication or sobriety, is ordinarily admissible as

of this section for any person who is under the influence of intoxicating liquor to drive or be in actual physical control of any vehicle within this State.

"(b) In any criminal prosecution for a violation of paragraph (a) of this section relating to driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance shall give rise to the following presumptions:

"1. If there was at that time .05% or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;

"2. If there was at that time in excess of .05% but less than .15% by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant;

"3. If there was at that time .15% or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor;

"4. The foregoing provisions of paragraph (b) shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether or not the defendant was under the influence of intoxicating liquor." (pp 18, 19).

relevant and competent evidence upon the issue of intoxication, at least where the accused voluntarily furnished the specimen for the test, or submitted without objection to its taking."

It is our holding that the results of the urinalysis taken and interpreted under the conditions described in the record before us were properly admissible as bearing upon the issue of whether or not defendant was under the influence of alcohol. We are not, it will be noted, holding that the finding of .25% of alcohol in the urine is conclusive evidence of intoxication, but rather that it is relevant and competent. The weight of the opinion of the experts, together with that of the other evidence in the case, is for the trier of the facts.

In the 1954 session (Act No 10) of the legislature, section 625, subparagraph (c) of the vehicle code* was amended by adding the italicized words thereto:

"On a second or subsequent conviction under this section *or a local ordinance substantially corresponding thereto,* he shall be guilty of a misdemeanor and punished."

In the case before us the people called to the stand the clerk of the Kalamazoo municipal court, who testified that he had charge of the records of such court. There was then offered in evidence, and received, an exhibit which, in the words of the court, "recites over the signature of the municipal justice in the warrant that William I. Miller did drive said motor vehicle while he the said William I. Miller was under the influence of intoxicating liquor in violation of chapter 5, section 2(a) of the police and license code of the city of Kalamazoo, Michigan, upon the public streets, highways, and places of said city." In the court's instructions to the jury

---

* CLS 1956, § 257.625, subd (c) (Stat Ann 1957 Cum Supp § 9.2325, subd [c]).

they were charged, in part, that they must find not only that defendant was the same person as was convicted in 1949, but that such conviction was for violation of an ordinance substantially corresponding to the statute. In this procedure there was no error. But appellant urges, also, that the amendment above set forth is being given a "retroactive" effect unintended by the legislature if convictions occurring prior to the passage of the amendment are considered in applying the penalties of the act. The argument of retroactivity as applied to statutes prescribing more onerous penalties for multiple infractions has been considered often by this court. See *People* v. *Mellor,* 302 Mich 537; *People* v. *Palm,* 245 Mich 396; and *In re Brazel,* 293 Mich 632. Heavier penalties for a second offense are well known to the law. They are in no manner *ex post facto,* nor do such amendments as we have before use have a retroactive effect. It is the subsequent offense that is punished more harshly, not the first.

There was no error in refusing to give appellant's requested instructions in verbatim form, or otherwise, in the charge. The instruction as given fairly covered the issues and the material substance embodied in the requests. *People* v. *Knoll,* 258 Mich 89.

Affirmed.

Dethmers, C. J., and Carr, Kelly, Black, Edwards, Voelker, and Kavanagh, JJ., concurred.