# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CYNTHIA FAITH TOEPLER,

        Defendant-Appellant.

UNPUBLISHED
December 6, 2016

No. 329017
Eaton Circuit Court
LC No. 14-020312-FH

Before: BOONSTRA, P.J., and SHAPIRO and GADOLA, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of operating a motor vehicle while intoxicated, third offense (OUI 3rd), MCL 257.625(1), driving with a suspended license, MCL 257.904(1), and failure to stop at the scene of an accident, MCL 257.618. She was sentenced as a third habitual offender, MCL 769.11, to serve 34 to 120 months in prison for the OUI 3rd conviction, and 90 days for both driving with a suspended license and failure to stop at the scene of an accident. Defendant appeals as of right the conviction for OUI 3rd. We affirm.

## I. FACTS

On August 7, 2014, Brandon VanPoppelen called 911 to report an incident that occurred in the drive-thru of the McDonald's restaurant he owns on West Saginaw Highway in Eaton County. VanPoppelen testified that there was a woman, later identified as defendant, in a car at the drive-thru talking incoherently. VanPoppelen asked her to pull off to the side so that he could call for help, but defendant pulled out of the drive-thru and drove over one of the curbs and onto Saginaw Highway. Darryl Walker was entering the McDonald's and also observed defendant's car drive over the curb and over some shrubbery and onto Saginaw Highway. Soon after, Walker got into his car and drove a short distance on Saginaw where he observed an accident scene involving defendant's car.

Clark Rodgers was stopped at a traffic light on Saginaw Highway on that date when his van was rear-ended by the car driven by defendant. An officer who was conducting a traffic stop nearby observed the collision. When he saw that defendant had not stopped and was poised to turn left from the intersection, he radioed in that he was observing a hit and run. A second officer, John Davidson, responded to the scene and blocked defendant's car. Davidson subsequently spoke with defendant, who denied having been in an accident. Defendant was barefoot and was wearing a hospital wrist band. She was mumbling and was difficult to

understand and her walking was unstable. Davidson described that as he led her out of the road and onto the grass, defendant stepped on a thistle and did not seem to be aware of it. Defendant also was unable to perform field sobriety tests. During the vertical gaze test defendant nearly fell over backward. Defendant was unable to stand still while Davidson instructed her in the walk and turn test and was unable to perform the test; she took nine steps forward, three steps back, and then fell over backward.

The results of a preliminary breath test were negative for alcohol. Defendant told the officer, however, that she had taken Prozac. Defendant was arrested and taken to the hospital where she told a nurse that she had taken "a couple of Xanax."

Shortly after her arrest, defendant was evaluated by Sergeant Casey Tietsort, who had received training as a drug recognition expert (DRE). At trial, Tietsort explained that a DRE is a police officer who is specially trained to identify whether someone is impaired and if so, which of seven drug categories might be causing the impairment: central nervous system depressants, central nervous system stimulants, hallucinogens, dissociative anesthetics, narcotic analgesics, inhalants, and cannabis. Over defendant's objection, the trial court permitted Tietsort to testify as an expert in the field of drug recognition.

Tietsort testified that the assessment involves a standardized process, beginning with a breath analysis for blood alcohol content followed by an interview of the arresting officer. Thereafter, the process involves a preliminary examination referred to as the "medical rule out," that involves initial observations and routine questions. Tietsort testified that during this step defendant's speech was thick and raspy, her eyelids were droopy, she appeared to be falling asleep, and questions had to be repeated. Also during this step of the process defendant told Tietsort that she suffered from a skin condition called sarcoidosis and that she took Diazepam (valium)[1] and pain medications. Tietsort attempted to examine defendant's eyes, but could not because defendant was falling asleep and would not open her eyes. Tietsort then conducted "divided attention tests," in which defendant was asked to listen and perform at the same time; during these tests, defendant estimated that only 16 seconds had passed during a 30-second period. In addition, a walk and turn test was discontinued for fear that defendant would fall, and defendant was unable to complete the "finger to nose" test. Defendant's muscle tone was observed as being "flaccid" and Tietsort observed no injection sites. This was followed by an interview during which defendant talked incoherently.

At the time of his assessment of defendant, Tietsort did not yet have access to the toxicology assessment results. Nonetheless, based upon his assessment Tietsort concluded that defendant was impaired by two classes of drugs: a narcotic analgesic such as Tramadol, and a central nervous system depressant, such as Xanax, Fluoxetine, or Cyclobenzaprine, which he said can cause "drunk-like behavior," affect balance, and cause drowsiness and dizziness. Tietsort opined that defendant was not able to safely operate a motor vehicle in her condition at the time of the accident. Tietsort further opined that defendant's impairment was caused by the medications she had ingested.

---

[1] The toxicology report did not detect the presence of Diazepam.

At the time of her arrest, defendant consented to a blood draw for toxicology testing. At trial, Michigan State Police Toxicology Technician Jennifer Wilson was admitted as an expert witness in the field of forensic toxicological testing, and testified that she conducted the testing on defendant's blood sample. Wilson testified that the results of defendant's toxicology report confirmed the presence of seven substances in defendant's blood, including Alprazolam (a benzodiazepine known as Xanax), which is a schedule-4 controlled substance, Tramadol (a narcotic analgesic for pain), Fluoxetine (an anti-depressant known as Prozac), Cyclobenzaprine (a muscle relaxant known as Flexeril), and metabolites (breakdown products of a drug in the bloodstream) of three other drugs. Wilson testified that the level of Alprazolam in defendant's blood was "within the therapeutic range." Tramadol measured above the calibration curve, but was still potentially within the therapeutic range. Wilson testified that the chemicals identified as present in defendant's blood at the time of testing can cause the effects of drowsiness and confusion (Xanax), nausea, sleeplessness, dizziness (Tramadol), nausea and anxiety (Prozac), and drowsiness, dizziness, and blurred vision (Flexeril).

Defendant was charged with operating a motor vehicle while intoxicated, third offense (OUI 3rd), MCL 257.625(1), driving with a suspended license, MCL 257.904(1), and failure to stop at the scene of an accident, MCL 257.618. At trial, defendant denied that she was intoxicated within the meaning of the statute and contended that her actions were the result of her medical condition known as sarcoidosis, chronic pain, and chronic depression, and not the result of the substances she had taken. Plaintiff testified that she had had outpatient surgery for a nodule in her lung two days before the accident, and claimed that she did not remember anything after the surgery, including the accident, until approximately a week after the surgery.

Defendant's expert witness, Robert John Belloto, Jr., a pharmacist with a Ph.D. in pharmacology, testified that sarcoidosis causes growths to develop that can cause pain or, if they affect the central nervous system, can result in symptoms that look like a stroke or confusion. He further indicated that the disease can cause fatigue and, depending on what part of the body is affected, can cause blackouts. Belloto testified that there is no evidence that Alprazolam (Xanax) impairs driving when the drug is taken routinely because the patient usually develops tolerance to the sedating effects of the drug. He testified that a therapeutic dose of Tramadol could cause sedation but that tolerance develops within one to two days. He testified that the drug commonly known as Prozac could cause sedation but could also cause stimulation, and that he would not expect it to impair driving. He also testified that he would not expect Flexeril, the muscle relaxant, to impair driving. He agreed, however, that all of these drugs are marketed and prescribed with warnings not to drive after taking those medications. Belloto testified that the effects of the combination of certain of the drugs defendant ingested could impair driving, but he thought that unlikely. Belloto did not observe defendant at the time of her arrest, however, and did not offer an opinion regarding whether on that day defendant was impaired by her disease or by the chemicals she had ingested.

## II. ANALYSIS

Defendant contends that the trial court abused its discretion by allowing Tietsort to testify as a drug recognition expert. She argues that in doing so, the trial court abdicated its "gatekeeping" function under MRE 702, and thereby violated her due process rights.

-3-

We first note that evidentiary errors, such as an erroneous decision to admit expert testimony, are not constitutional in nature. *People v Blackmon (On Remand)*, 280 Mich App 253, 260; 761 NW2d 172 (2008). Because defendant has not cited adequate authority supporting the proposition that an error in admitting expert testimony constitutes a due process violation, we conclude that this issue has been abandoned. See *People v Kevorkian*, 248 Mich App 373, 389; 639 NW2d 291 (2001).

We review a preserved evidentiary issue for an abuse of discretion. *People v Orr*, 275 Mich App 587, 588; 739 NW2d 385 (2007). Specifically, this Court reviews a trial court's qualification of an expert witness and its ultimate ruling whether to admit or exclude expert witness testimony for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). An abuse of discretion occurs "when 'an unprejudiced person' considering 'the facts upon which the trial court acted, [would] say that there was no justification or excuse for the ruling made.'" *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 762; 685 NW2d 391 (2004), quoting *People v Hendrickson*, 459 Mich 229, 235; 586 NW2d 906 (1998) (opinion by Kelly, J.), quoting *Detroit Tug & Wrecking Co v Wayne Circuit Judge*, 75 Mich 360, 361; 42 NW 968 (1889). If an error in the admission of evidence is found, the defendant has the burden of demonstrating that it is more probable than not that a miscarriage of justice has resulted from the error. *People v Knapp*, 244 Mich App 361, 378; 624 NW2d 227 (2001). We will not reverse unless the defendant demonstrates that, on the entire record, the error appears to have been outcome determinative. *Id*.

Pursuant to MRE 702, a trial court is permitted to admit expert opinion testimony in areas of specialized knowledge. MRE 702 provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court is required to exercise its discretion as a "gatekeeper" to ensure that expert testimony admitted at trial pursuant to MRE 702 is reliable. *People v Yost*, 278 Mich App 341, 393-394; 749 NW2d 753 (2008). The trial court may admit expert testimony only after ensuring that the expert testimony meets that rule's standard of reliability. *People v Lane*, 308 Mich App 38, 52; 862 NW2d 446 (2014). "MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert*, 470 Mich at 782. The purpose is to ensure that the jury is not relying upon unproven and unsound scientific methods. *Lane*, 308 Mich App at 52.

When faced with a proffer of scientific or technical testimony, Michigan courts apply the factors articulated in *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579, 593; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *People v Kowalski*, 492 Mich 106, 120; 821 NW2d 14 (2012). Under *Daubert*, a trial court may consider (1) whether the theory in question has been tested, (2) whether it has been subject to peer review and publication, (3) the potential rate of

error, and (4) whether the theory has gained general acceptance. *Daubert*, 509 US at 593-594. These factors are not exhaustive, however; the inquiry is flexible, and the subject of the inquiry is the scientific validity, and therefore the relevance and reliability, of the theory in question. *Id.*, 509 US at 594-595.

Here, defendant contends that the trial court abused its discretion by permitting Sergeant Tietsort to testify as a drug recognition expert. She argues that Tietsort is neither a doctor nor a pharmacologist, and asserts that his "drug recognition" training did not qualify him to rule out medical conditions as a possible source of impairment or to testify as an expert regarding the drugs she had taken or whether she was impaired.

Michigan courts have not determined, and we do not decide here, whether the field of drug recognition is scientifically valid under a *Daubert* analysis. In this case, however, we need not reach the issue of whether the trial court abused its discretion in permitting Tietsort to testify as a drug recognition expert because any error, if it occurred, was harmless. Here, defendant was charged with operating a vehicle while intoxicated under MCL 257.625(1), which provides in pertinent part:

> (1) A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person is operating while intoxicated. As used in this section, "operating while intoxicated" means any of the following:

> (a) The person is under the influence of alcoholic liquor, a controlled substance, or other intoxicating substance or a combination of alcoholic liquor, a controlled substance, or other intoxicating substance.

Thus, for purposes of this case, defendant violated MCL 257.625(1) if she (1) operated a motor vehicle, (2) on a highway within this state, and (3) she was operating while intoxicated. Defendant was "operating while intoxicated" as defined by the statute if she was under the influence of alcoholic liquor, a controlled substance, other intoxicating substance, or a combination of those items. MCL 257.625(1). Here, there is no dispute that defendant was operating a vehicle upon a highway in this state when she rear-ended another vehicle at a traffic light, and then drove away. The only question is whether she was "operating while intoxicated" within the meaning of the statute.

On that element, ample evidence was introduced at trial apart from the testimony of Offficer Tietsort. Officer Davidson testified that when he stopped defendant shortly after she struck the van, defendant was mumbling and was difficult to understand, denied that she had been in an accident, and was unable to perform field sobriety tests. Witnesses at McDonald's a few minutes earlier had observed defendant drive over the curb and over shrubbery when leaving the parking lot and one witness observed that defendant was talking incoherently. The toxicology testing confirmed the presence of seven substances in defendant's blood, including the schedule-4 controlled substance commonly known as Xanax, prescription narcotic pain medication commonly known as Tramadol, an anti-depressant commonly known as Prozac, and a muscle relaxant commonly known as Flexeril. Toxicology technician Wilson testified that the

chemicals present in defendant's blood at the time of testing can cause the behaviors that defendant was exhibiting, namely, drowsiness, confusion, dizziness, and blurred vision. The presence of intoxicating substances in defendant's blood, as evidenced by the blood tests, has the tendency to prove that any impaired driving was, in fact, caused by the consumption of those substances. See *People v Miller*, 357 Mich 400, 407; 98 NW2d 524 (1959).

Tietsort's testimony that defendant was behaving as though she had taken Xanax and Prozac was therefore cumulative to the toxicology evidence that defendant had in fact ingested those drugs and others. Tietsort's testimony that defendant's behavior was caused by those substances was cumulative to that of Wilson that those drugs can cause those behaviors. Because Tietsort's testimony was cumulative, there is no indication that his testimony, even if erroneously admitted, was other than harmless. *Knapp*, 244 Mich App at 378. Apart from Tietsort's testimony there was still ample evidence that (1) defendant was operating her motor vehicle on a highway, (2) defendant had taken both a controlled substance and several other potentially intoxicating substances, (3) defendant was exhibiting the behavior commonly produced by those substances. The jury therefore was presented with sufficient evidence from which it could conclude that defendant was operating a motor vehicle while intoxicated, apart from Tietsort's testimony. We simply cannot conclude, on this record, that a miscarriage of justice occurred as a result of the trial court's decision to qualify Tietsort as an expert, or that the potentially erroneous admission of this testimony was outcome determinative. *Id*.

Defendant also challenges the sufficiency of the evidence, arguing that given her testimony and Belloto's testimony, the prosecution failed to sufficiently establish that she was impaired by substances as opposed to suffering from an underlying medical condition. We review a challenge to the sufficiency of the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). In considering a challenge to the sufficiency of evidence, we review the evidence in the light most favorable to the prosecution to ascertain whether a rational trier of fact could have found that the elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

Defendant concedes that she had blacked out at the time of the events in question. She does not dispute that she was driving in an impaired manner, that she had ingested various substances before driving, and that those substances were present in her blood when her blood was tested shortly after her arrest. Defendant argues, however, that her impaired state was not caused by the intoxicating substances in her system but rather by an underlying medical condition. Although defendant presented her theory that it was her illness and not the substances that caused her impairment, the jury was not obligated to accept this theory. Rather, the jury was free to believe or disbelieve any of the evidence presented to it. *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999). Nor was the prosecution obligated to disprove theories that may support defendant's innocence; rather, the prosecution was only required to introduce sufficient evidence to convince a reasonable jury of defendant's guilt despite a contradictory theory. *People v Solmonson*, 261 Mich App 657, 662-663; 683 NW2d 761 (2004). Viewing the evidence in a light most favorable to the prosecution, it was entirely reasonable for the jury not to credit defendant's evidence and to conclude that defendant's condition at the time of the incident was the result of ingesting intoxicating substances. We conclude that sufficient evidence existed

from which a rational trier of fact could have found that the elements of the crime were proven beyond a reasonable doubt.

Affirmed.

/s/ Mark T. Boonstra
/s/ Douglas B. Shapiro
/s/ Michael F. Gadola